# KOMATSU

EXHIBIT F

September 23, 2020

**VIA FEDERAL EXPRESS AND FACSIMILE (412.246.1763)**

Samuel J. Cordes, Esq.
Rothman Gordon P.C.
310 Grant Street
Third Floor, Grant Building
Pittsburgh, PA 15219

Re:   Determination Regarding Mr. Trevor Curtis's Appeal of Denied Claim for Benefits under the Komatsu U.S. Pension Plan

Dear Mr. Cordes:

The purpose of this letter is to inform you that the Claims and Appeals Subcommittee of the Komatsu Pension and Investment Committee (the "Subcommittee"), in its capacity as the appeals fiduciary for the Komatsu U.S. Pension Plan (the "Plan"), has reviewed the appeal that you submitted on behalf of Mr. Trevor Curtis, which was dated and received on May 26, 2020, appealing his denied claim for benefits under the Plan (such appeal, the "Appeal" or "Mr. Curtis's Appeal") and has made a determination. As explained in more detail below, after careful consideration of the Appeal and related documents, including, but not limited to, the terms of the Plan and the retirement kits that were provided to Mr. Curtis in connection with his request to start his benefit payments under the Plan, the Subcommittee has concluded that Mr. Curtis is not entitled to the additional benefit that is the subject of the Appeal. Accordingly, the Subcommittee has denied Mr. Curtis's appeal of his denied claim for benefits under the Plan.

## Background Facts

Mr. Trevor Curtis began working for a predecessor to the Komatsu Mining Corp. (the "Company") on December 19, 1974, and remained an employee of the Company until his retirement on July 19, 2019. During his employment, Mr. Curtis participated in, and accrued a benefit under, both Supplement 4 (the Joy Technologies Inc. Pension Plan for Salaried and Nonbargaining Hourly Employees) and Supplement 6 (the American Longwall, Inc. Retirement Plan) of the Plan.[1] Mr. Curtis began receiving benefit payments under the Plan on or about January 1, 2020, when he was 69 years old.

---

[1] Mr. Curtis also participated in, and accrued a benefit under, the Joy Global Supplemental Pension Plan (the "Supplemental Plan"). Although the Supplemental Plan was referenced in the Appeal in the "Re" line and the statement that you represent Mr. Curtis with respect to his participation in the Supplemental Plan, the Subcommittee observed that the Supplemental Plan was not otherwise referenced in the Appeal. There being no arguments, assertions or contentions in the Appeal that Mr. Curtis is entitled to Supplemental Plan benefits that have been denied, the Subcommittee concluded that Mr. Curtis did not appeal the April 13, 2020 denial of his claim for benefits under the Supplemental Plan.

The letter dated April 13, 2020 from Mr. Matthew Stuart, providing notice that Mr. Curtis's claim for benefits was denied (the "Claim Denial Letter"), summarizes the background facts associated with Mr. Curtis's claim and appeal. The Subcommittee observed that the Appeal did not challenge or contradict any of the facts summarized in the Claim Denial Letter or present new facts distinct from the facts described in the Claim Denial Letter. Accordingly, the Background summary in the Claim Denial Letter is incorporated by reference, and capitalized terms not otherwise defined in this letter have the meanings assigned in the Claim Denial Letter.

As previously noted, the Appeal challenging the denial of Mr. Curtis's claim for benefits was received on May 26, 2020. In accordance with the Plan's claims and appeals procedures, the Subcommittee was obligated to respond to the Appeal within 60 days, unless special circumstances existed for the Subcommittee to extend the review period by an additional 60 days. On July 24, 2020, before the expiration of the initial 60-day period, ERISA counsel for the Plan ("ERISA Counsel") sent a copy of a letter from Mr. Stuart to you, advising that the Subcommittee extended the deadline for responding to the Appeal to no later than September 23, 2020.

### Summary of Assertions in Appeal

The assertions described in the Appeal submitted on Mr. Curtis's behalf can generally be organized into four arguments.

First, Mr. Curtis asserts that he is owed an "Additional Benefit" based on the following paragraph in the Retirement Kits:

> **Additional Benefit Due to Late Commencement** – an additional benefit will be payable to you because your Benefit Commencement Date is after your Normal Retirement Date. The Additional Benefit is the sum of payments which would have been made had you started the monthly benefit on your Normal Retirement Date, plus interest through your Benefit Commencement Date.

Mr. Curtis contends that he is entitled to the Additional Benefit because he commenced benefits after his Normal Retirement Date.

Second, Mr. Curtis asserts that the Additional Benefit description in the Retirement Kits is consistent with the Late Retirement provisions of the main portion of the Plan (the "Wrap Plan"), Supplements 4 and 6 of the Plan, and the SPD that is applicable to Mr. Curtis. More specifically, on appeal, Mr. Curtis states that the Additional Benefit description in the Retirement Kits corresponds with the following sections of the Plan (collectively, the "Plan's Late Retirement Provisions"):

- *Section 4.6(c) of the Wrap Plan*, which provides that a participant's accrued benefit "shall be increased . . . to reflect the value of the Participant's benefit that otherwise would have been payable to the Participant had he retired at Normal Retirement Date."

- *Section 3.8 of Supplement 4*, which provides that a participant's benefit is increased "to reflect the Actuarial Equivalent value of the Covered Employee's benefit that otherwise would have been payable to the Covered Employee at his or her Normal Retirement Date."

- *Section 3.2 of Supplement 6*, which provides that a participant who retires after his Normal Retirement Date will be entitled to a monthly benefit "equal to the greater of his Accrued Benefit, multiplied by a late retirement factor."

In addition, Mr. Curtis asserts that the description of the Late Retirement benefit in the SPD further supports his entitlement to the Additional Benefit described in the Retirement Kits.

Third, Mr. Curtis contends that the Wrap Plan, Supplements 4 and 6, the SPD, and the Retirement Kits are all part of the Plan document for the Plan "and, therefore should be construed together and interpreted [*capitalization in original*] as a whole, each contributing to the ascertainment of the meaning of the Kit language." Thus, the description in the Retirement Kits of the Additional Benefit "should be honored and Mr. Curtis provided the Additional Benefit promised."

Fourth, as part of the appeal, Mr. Curtis implies that the Additional Benefit was "promised" and that he "reasonably relied upon" the quoted provision of the Retirement Kits, believing that he would receive an Additional Benefit following his retirement.

## Documents Reviewed in Consideration of Appeal

In considering Mr. Curtis's appeal, the following documents were provided for review and consideration:

1. <u>All Information Reviewed and Considered in Connection with the claim for benefits</u>.

   a. *Plan.* The Komatsu U.S. Pension Plan (as amended and restated effective November 1, 2012 and subsequent amendments thereto, including the amendment and restatement effective November 1, 2019, executed August 31, 2020), which Plan document includes Supplement 4 (formerly the Joy Technologies Inc. Pension Plan for Salaried and Nonbargaining Hourly Employees, which was merged into the Plan) and Supplement 6 (formerly the American Longwall, Inc. Retirement Plan, which was merged into the Plan).
   b. *Supplemental Plan.* The Joy Global Supplemental Pension Plan.[2]
   c. *Summary Plan Description.* The summary plan description for Supplement 4 of the Plan.
   d. *Retirement Kits for the Plan.* Retirement Kits, dated July 25, 2019 for Supplement 4, and July 19, 2019 for Supplement 6, describing Mr. Curtis's benefits payable pursuant to Supplement 4 and Supplement 6 and including benefit election forms.
   e. *August 7, 2019 and August 9, 2019 Emails.* August 7, 2019 email from the Plan Representative to Mr. Curtis, stating that the language in the Retirement Kits was "geared to participants that terminated prior to age 65" and commenced payments after their Normal Retirement Date. The August 9, 2019 email reply from Mr. Curtis to the Plan Representative does not inquire any further about an "Additional Benefit."
   f. *Initial Benefit Election Forms for the Plan.* Mr. Curtis's completed benefit election forms, dated August 13, 2019, electing pension benefits under Supplement 4 and Supplement 6 with an annuity starting date of January 1, 2020. The benefit election forms were included in the Retirement Kits.
   g. *Benefit Quote Letter for Supplemental Plan.* Correspondence dated July 30, 2019, from the Plan Representative to Mr. Curtis, describing the supplemental benefits payable to Mr. Curtis and including a benefit election form for such benefits, which Mr. Curtis signed and dated August 13, 2019.
   h. *Claim Letter.* Correspondence, dated October 11, 2019 and received October 16, 2019, from you to the Company, describing Mr. Curtis's claim for benefits under the Plan.

---

[2] As previously noted, the Subcommittee determined that Mr. Curtis did not appeal the denial of his claim for benefits under the Supplemental Plan.

i. *Confirmation of Designated Representative Status.* Correspondence, dated November 7, 2019, from ERISA Counsel to you, requesting confirmation of your status as Mr. Curtis's designated representative with respect to the claim for benefits; and correspondence, dated November 14, 2019, from you to ERISA Counsel, confirming your status as Mr. Curtis's designated representative.
j. *Summary of Payment Options.* Correspondence, dated December 18, 2019, from ERISA Counsel to you, describing that Mr. Curtis was eligible to receive Plan benefits using a January 1, 2020 annuity starting date or an August 1, 2019 retroactive annuity starting date.
k. *Revised Benefit Election Forms for the Plan.* Mr. Curtis's revised benefit election forms for Supplement 4 and Supplement 6, dated December 23, 2019 and December 28, 2019, respectively, electing pension benefits using a retroactive annuity starting date of August 1, 2019.
l. *Miscellaneous Correspondence.* Correspondence, dated January 8, 2020, from ERISA Counsel to you, extending the deadline by which to respond to the claim for benefits from January 14, 2020 to April 13, 2020; correspondence, dated February 26, 2020 and March 2, 2020, between ERISA Counsel and you, confirming that Mr. Curtis is still seeking the claim for benefits despite the fact that Mr. Curtis's benefit payments had commenced January 1, 2020 using an August 1, 2019 retroactive annuity starting date.
m. *U.S. Federal Income Tax Code of 1986*, as amended.
n. *Employee Retirement Income Security Act of 1974*, as amended ("ERISA").

2. April Memorandum. A memorandum, dated April 10, 2020, from the Plan Representative to Mr. Stuart, analyzing the claim for benefits.

3. Claim Denial Letter. The letter, dated April 13, 2020, from Mr. Stuart to you advising that Mr. Curtis's initial claim for benefits was denied.

4. Delivery Confirmation. The delivery confirmation confirming delivery of the Claim Denial Letter to the fax number for you, on April 13, 2020.

5. Appeal Letter. The letter to the Subcommittee, dated May 26, 2020, describing Mr. Curtis's appeal of the denial of his claim for benefits.

6. Appeal Response Extension Letter. The letter, dated July 24, 2020, from Mr. Stuart to you advising that the Subcommittee extended the period for responding to Mr. Curtis's appeal to September 23, 2020.

7. September Memorandum. A memorandum, dated September 2, 2020, from the Plan Representative to the Subcommittee addressing the appeal.

### Applicable Plan Provisions

The Plan document is organized into the Wrap Plan, which provides terms that are generally applicable to all participants, and supplements that provide terms specifically applicable to participants eligible for the relevant supplement. Two of those supplements, Supplement 4 and Supplement 6, apply to Mr. Curtis's benefits under the Plan.

### Wrap Plan

Section 1.5(bbb) defines the "Plan" as "the Komatsu U.S. Pension Plan, as set forth herein, and as may be amended from time to time," thereby describing what constitutes the plan document for the Plan.

Section 1.5(ww) of the Wrap Plan defines "Normal Retirement Date" as "the first day of the month coinciding with or next following the day on which a Participant attains Normal Retirement Age." Section 1.5(vv) of the Wrap Plan provides that "Normal Retirement Age" means age 65. (Section 1.4(o) of Supplement 4 of the Plan also provides that "Normal Retirement Age" means age 65.)

- Mr. Curtis's date of birth was April 25, 1950. Therefore, Mr. Curtis's Normal Retirement Date was May 1, 2015.

Section 4.6(c) of the Wrap Plan provides that "[i]f a Participant remains employed after his or her Normal Retirement Date, the Participant's benefit shall not become payable until the Participant's Late Retirement Date." (Section 3.8(a) of Supplement 4 of the Plan provides nearly identical language.)

- Because Mr. Curtis remained employed by Komatsu after his Normal Retirement Date, his Plan benefit was not payable until his Late Retirement Date.

Section 1.5(nn) of the Wrap Plan defines "Late Retirement Date" as "the first day of the month coincident with or next following the date the Participant terminates from employment with all Controlled Group Affiliates after his or her Normal Retirement Date."

- Because Mr. Curtis retired on July 19, 2019, his Late Retirement Date was August 1, 2019.

Sections 4.2 and 4.6(c) of the Wrap Plan provide that a participant's benefit on his or her Late Retirement Date is equal to his or her Accrued Benefit determined as of the date of the participant's termination of employment, which, for each year of continued employment after his or her Normal Retirement Date, is increased by the greater of (i) any additional accruals for the year attributable to additional Vesting Service or Benefit Service, or (ii) an actuarial adjustment to reflect the value of the participant's benefit that otherwise would have been payable. Section 4.6(c) of the Wrap Plan also provides that in the case of a covered employee who remains employed after his or her Normal Retirement Date, such covered employee's Accrued Benefit is equal to his or her Accrued Benefit as of April 30, 2012 (i.e., the date benefit accruals for salaried and nonbargaining hourly employees were frozen), increased to reflect the actuarial equivalent value of the benefit that otherwise would have been payable at age 65.

- Because Mr. Curtis continued to be employed after his Normal Retirement Date (May 1, 2015), and his Normal Retirement Date occurred after the date his Accrued Benefit was frozen (April 30, 2012), Mr. Curtis's benefit on his Late Retirement Date is equal to his Accrued Benefit as of April 30, 2012, actuarially increased to reflect the value of the benefit that he would have received on his Normal Retirement Date.

Section 1.5(g) of the Wrap Plan defines a participant's Benefit Commencement Date as "the actual date on which the first payment of a Participant's benefit as an annuity is made, or the actual date on which a lump sum is paid."

Section 12.2 of the Wrap Plan outlines the Subcommittee's discretionary authority to make all determinations and resolve all matters in connection with deciding an appeal, and the decision of the Subcommittee shall be final and binding.

Section 11.1 of the Wrap Plan provides that the Board of Directors of the Company and the Komatsu Plan Sponsor Committee, acting as its delegate, "shall have the right at any time to amend any or all of the provisions in this Plan, in whole or in part."

### Supplement 4

Section 3.1 of Supplement 4 of the Plan provides the formula for calculating a participant's Accrued Benefit, and Section 3.6 of Supplement 4 provides that a participant who retires at his Normal Retirement Date will receive his Accrued Benefit.

Section 3.8(b) of Supplement 4 provides that the retirement benefit for a covered employee that becomes payable on a "Late Retirement" payment date is equal to the employee's normal retirement benefit, determined under Supplement 4, and, for a covered employee who was credited with service on or after January 1, 1988, multiplied by a fraction equal to the covered employee's Years of Benefit Service through his Late Retirement payment date over his Years of Benefit Service up to his Normal Retirement payment date (as adjusted). Section 3.8(e) provides that in the case of a covered employee who remains employed after his or her Normal Retirement Date, such covered employee's Accrued Benefit shall be equal to his or her Accrued Benefit as of April 30, 2012 (the freeze date), increased to reflect the "Actuarial Equivalent" value of the participant's benefit that otherwise would have been payable at the covered employee's Normal Retirement Date.[3]

Section 1.4(b) of Supplement 4 of the Plan provides that the "Actuarial Equivalent" is determined based on (i) the 1984 Unisex Pension Table, set back three years for beneficiaries, and (ii) the interest rate in effect during each calendar year that is equal to the average of the Pension Benefit Guaranty Corporation's published immediate annuity rate in effect on October 1 for each of the preceding 10 years rounded to the nearest 0.01%.

### Supplement 6

Section 3.1 of Supplement 6 of the Plan provides that the "Accrued Benefit" is the monthly retirement income that is payable at normal retirement age, and sets forth the formula for determining the Accrued Benefit.

Section 3.2 of Supplement 6 provides that when a covered employee retires at least one month after his Normal Retirement Date (i.e., a "Late Retirement Date"), the monthly benefit beginning on his Late Retirement Date shall be an amount equal to the greater of his Accrued Benefit on the Late Retirement Date and his Accrued Benefit on his Normal Retirement Date increased by a late retirement factor (ranging from 1.06 to 1.34) determined based upon the number of years (ranging from one to five) that his payments begin after his Normal Retirement Date.

### Analysis and Determinations

### The Retirement Kits Do Not Entitle Mr. Curtis to an Additional Benefit

In the claim for benefits and again in the Appeal, Mr. Curtis grounds his assertion that he is entitled to the Additional Benefit based on the following paragraph in the two retirement kits (one each for Supplement 4 and Supplement 6) (collectively, the "Retirement Kits") that were provided to him in connection with his request to start his benefit payments:

> **Additional Benefit Due to Late Commencement** – an additional benefit will be payable to you because your Benefit Commencement Date is after your Normal Retirement Date. The Additional Benefit is the sum of payments which would have been made had you started the monthly benefit on your Normal Retirement Date, plus interest through your Benefit Commencement Date.

---

[3] Benefit Service enhancements referenced in Section 3.8(e) of Supplement 4 do not apply to Mr. Curtis.

The Retirement Kits are simply ministerial documents that were created for the purpose of assisting Plan participants with their election of the timing and form of their retirement benefits. The Retirement Kits do not provide any substantive entitlement to benefits, which are governed solely by the terms of the Plan as set forth in the Plan document (and, as described in more detail below, the Retirement Kits are not part of the Plan document).

Moreover, contrary to the assertion in the Appeal, the Retirement Kits do not provide for the payment of an Additional Amount to Mr. Curtis, and Mr. Curtis had reason to know this upon his review of the Retirement Kits. Pages 7 and 8 of the Retirement Kits list the specific benefit amounts that were payable to Mr. Curtis based upon the different forms of benefit payment available to him under the Plan, and, notably, the Additional Amount claimed by Mr. Curtis is not identified as payable. Indeed, details on the Additional Benefit are tellingly absent from the Retirement Kits, and there is no mention of this benefit other than the general paragraph that, as described below, Mr. Curtis was advised by the Plan Representative did not apply to him. It is only logical that if the Additional Amount were payable to Mr. Curtis, it would be presented in the same manner as the rest of his Accrued Benefit and the optional forms available to him.

Any confusion over his entitlement to the Additional Benefit was dispelled in July 2019—before Mr. Curtis's Late Retirement Date and before he submitted his initial benefit election—when Mr. Curtis was advised that the Additional Benefit paragraph in the Retirement Kits was general in nature and did not apply to him. In fact, both verbally and in an email on August 7, 2019, the Plan Representative advised Mr. Curtis that the description in the Retirement Kits did not apply and that it was intended for participants who terminated employment prior to their Normal Retirement Date and who had a Benefit Commencement Date after their Normal Retirement Date. Moreover, Mr. Curtis was further informed that the amount of his monthly benefits already was increased to account for his later starting date.

Mr. Curtis takes the Additional Benefit paragraph from the Retirement Kits out of context. In context, the reasonable conclusion is that the Retirement Kits do not entitle Mr. Curtis to the Additional Benefit. As a result, for the reasons summarized above, the Subcommittee concluded that the Additional Benefit paragraph from the Retirement Kits does not entitle Mr. Curtis to an Additional Benefit.

### The Plan Document Does Not Provide for an Additional Benefit

The Appeal asserts that the Additional Benefit paragraph in the Retirement Kits is consistent with the Late Retirement provisions of the Plan and SPD, and those provisions entitle Mr. Curtis to an Additional Benefit. Mr. Curtis also asserts that the SPD and Retirement Kits are part of the Plan, and their terms entitle him to an Additional Benefit.

There is no provision in the Plan document that provides a participant who remains employed past his Normal Retirement Date with an "Additional Benefit" (under any name) that is equal to the sum of the monthly benefits that would have been paid had benefits commenced on the participant's Normal Retirement Date through his Benefit Commencement Date. Nevertheless, in his appeal, Mr. Curtis contends that he is entitled to the Additional Benefit under the Plan's Late Retirement Provisions, the SPD, and the Retirement Kits, and that these documents all are part of the Plan document (in accordance with which the Plan must be administered) despite not being formally identified as such. Each of these arguments is addressed in turn.

*The Plan's Late Retirement Provisions Do Not Provide for the Additional Amounts.* The Plan's Late Retirement Provisions describe the calculation of the benefit payable to a participant who, like Mr. Curtis, continues employment beyond his Normal Retirement Date and becomes entitled to a "Late Retirement Benefit." *See* Sections 1.5(nn) and 4.6(c) of the Wrap Plan, Section 3.8 of Supplement 4 and Section 3.2 of Supplement 6. These provisions provide a participant who

works beyond his Normal Retirement Date with an increased monthly benefit amount that reflects the fact that his benefit is not paid during the period he is employed after his Normal Retirement Date. *See* Section 4.6(c)(ii)(A) of the Wrap Plan, Section 3.8(e) (describing the actuarial adjustment to the benefit of a Frozen Benefit Participant whose benefit starts at his Late Retirement Date); also Section 3.8 of Supplement 4 and Section 3.2 of Supplement 6.

The SPD's description of the Late Retirement Benefit beginning on page P-14 of the SPD is consistent with the Plan's Late Retirement Provisions:

> You may decide to work beyond age 65 and retire at a later date. If you do, you will not receive pension payments while you remain actively employed by the Company. Your late retirement benefit will be determined using the pension formula described above. However, when you retire, your benefit is based on your Final Average Earnings and total Benefit Service (including your years of Benefit Service after age 65 but not after the Benefit Freeze Date) when you actually retire. Your late retirement benefit will be actuarially adjusted to reflect the fact that your benefit is not paid while you remain actively employed by the Company.

*See also* Section 4.6(c) of the Wrap Plan, Section 3.8 of Supplement 4 and Section 3.2 of Supplement 6. Contrary to Mr. Curtis's contention in his appeal, neither the Plan's Late Retirement Provisions nor the SPD includes any reference to the Additional Benefit (or a similar benefit by any other name). In addition, neither the Plan's Late Retirement Provisions nor the SPD provides for a benefit equal to the sum of payments that would have been paid had Mr. Curtis commenced his benefit at his Normal Retirement Date.

The Additional Benefit described in the Retirement Kits is consistent with the Plan's provisions governing retroactive annuity starting dates ("RASD") in Section 5.6(c) of the Wrap Plan, which, if elected by an eligible participant, provide the participant with the sum of the missed payments, plus interest, between the RASD and the actual benefit commencement date.[4] By contrast, the Plan's Late Retirement Provisions describe an actuarially adjusted Late Retirement Benefit, which is an increased monthly benefit amount that is provided because the participant who remains employed after his Normal Retirement Date cannot start receiving benefit payments until his Late Retirement Date (i.e., after his actual termination of employment). As such, the Subcommittee concluded that the Additional Benefit described in the Retirement Kits is the RASD described in Section 5.6(c) of the Wrap Plan, which Mr. Curtis does not claim he is entitled to receive[5] and which is different from the benefit described in the Plan's Late Retirement Provisions that do not provide for any Additional Benefit.

It should be noted that there is no disagreement that the Plan's Late Retirement Provisions apply to Mr. Curtis. In fact, Mr. Curtis is receiving Late Retirement benefits that were determined according to these provisions of the Plan, and, importantly, Mr. Curtis does not contend that his benefits were miscalculated. Contrary to Mr. Curtis's assertions in his appeal, there is nothing in the Plan's Late Retirement Provisions describing a benefit that is owed to a late retiree equal to the sum of monthly benefits that would have been paid for the period from the participant's Normal Retirement Date to the date that pension benefits actually begin; the Plan's Late Retirement Provisions provide only for an increased monthly benefit amount that Mr. Curtis is currently

---

[4] The Plan has been consistently administered to provide the "Additional Benefit" described in the Retirement Kits only in instances where a participant is eligible to elect, and elects, a retroactive annuity starting date using his Normal Retirement Date for the calculation of his benefit. In any event, the Appeal does not request an RASD, and you previously clarified that Mr. Curtis seeks an Additional Benefit regardless of what annuity starting date was used.

[5] *See* note 4.

receiving. Thus, the Subcommittee concluded that the Plan's Late Retirement Provisions do not entitle Mr. Curtis to the Additional Benefit.

*SPD and Retirement Kits Are Not Part of the Plan*. The Appeal asserts that the SPD and the Retirement Kits are part of the Plan document, even though not formally labeled as such, and provide the requisite Plan terms for Mr. Curtis to receive the Additional Benefit.

The Subcommittee considered this argument and concluded that, although the SPD and the Retirement Kits fill important roles, they do not constitute the Plan document, nor are they part of the Plan document. The Supreme Court has made it clear that "the statements in a summary plan description 'communicate with beneficiaries about the plan, but do not themselves constitute the terms of the plan.'" *U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1543 n.1 (2013) (alterations omitted) (quoting *CIGNA Corp. v. Amara*, 63 U.S. 421, 438 (2011)). The Subcommittee determined that Mr. Curtis's efforts to treat the Retirement Kits as part of the Plan document are even further afield. As previously described, the Retirement Kits are ministerial documents that assist Plan participants with the election and form of their retirement benefits. The Retirement Kits do not purport to be formal summaries of the Plan's terms or to provide substantive benefits, and they have never been treated in this way. Moreover, Section 1.5(bbb) of the Wrap Plan establishes that the Komatsu U.S. Pension Plan is "as set forth herein," thereby precluding other documents from constituting the Plan document (either individually or collectively). And the authority to amend the Plan document is reserved to the Company acting through its Board of Directors or the Komatsu Plan Sponsor Committee (as its delegate), meaning that the Retirement Kits, which are not adopted by the Board of Directors or the Komatsu Plan Sponsor Committee, are also precluded from amending the Plan document. *See* Section 11.1 of the Wrap Plan. For these reasons, the Subcommittee concluded that the SPD and the Retirement Kits do not, and cannot, constitute part of the Plan.

Mr. Curtis contends on appeal that the SPD, Retirement Kits and the Plan's Late Retirement Provisions should be "construed together and interpreted [*capitalization in original*] as a whole . . . to the ascertainment of the meaning of the [Retirement] Kit language." However, interpreting these documents together and as a whole does not achieve Mr. Curtis's desired outcome. The SPD and the Plan's Late Retirement Provisions are consistent with each other and describe the benefit that Mr. Curtis is already receiving: an actuarially increased monthly benefit reflecting his continued employment beyond his Normal Retirement Date. In addition, neither the SPD nor the Plan's Late Retirement Provisions support Mr. Curtis's assertion that he is entitled to the Additional Benefit that is referenced in the Retirement Kits. Therefore, the Subcommittee concluded that the Plan's Late Retirement Provisions, the SPD and the Retirement Kits, taken as a whole, do not entitle Mr. Curtis to an Additional Benefit. Because ERISA Section 404(a)(1)(D) requires that the Plan be administered in accordance with its terms, the Subcommittee found that there was no basis to provide the Additional Benefit to Mr. Curtis.

### Mr. Curtis Could Not Have Reasonably Relied on the Retirement Kits for the Additional Benefit

The Appeal implies that Mr. Curtis reasonably relied on the Additional Benefit paragraph of the Retirement Kits to conclude that he was owed an Additional Benefit. However, as described above, Mr. Curtis was advised multiple times that he was not entitled to an Additional Benefit under either the Retirement Kits or the Plan before completing his initial benefit election forms. Most notably, Mr. Curtis was informed by the Plan Representative both verbally and by email that the Additional Benefit paragraph in the Retirement Kits did not apply to him and instead applied to participants who terminated employment before their Normal Retirement Date but commenced their pension benefits after their Normal Retirement Date.

10

Moreover, the Subcommittee concluded that the Retirement Kits themselves should have led Mr. Curtis to clearly understand that he was not entitled to an Additional Benefit.

- There is no specific benefit dollar amount for an Additional Benefit provided in the Retirement Kits, despite the fact that Mr. Curtis's Late Retirement benefits based on various payment options were all detailed in the Retirement Kits.

- The Participant Authorization section on page 10 of the Retirement Kits, to which Mr. Curtis agreed, includes the following statement: "I have been informed of the actual or the estimated amount of my benefit under each optional form of payment currently available under the terms of the Plan. I elect to have my benefit paid to me as I have indicated on this form." However, no amount for an Additional Benefit is provided in the Retirement Kits.

- The Relative Value Comparison section on page 13 of the Retirement Kits includes the following statement: "The amount of your actual benefit is provided in the enclosed benefit statement." Again, no amount for an Additional Benefit is provided in the Retirement Kits.

- The Relative Value Comparison section on page 13 of the Retirement Kits provides the following: "Please refer to Notice 1 – Description of Payment Options for a description of your payment options and Form 1 – Benefit Election Form for the actual dollar amounts payable under the various payment options available to you." However, Notice 1 and Form 1 do not list an amount for an Additional Benefit.

Based on the above, the Subcommittee concluded that Mr. Curtis knew and agreed that an Additional Benefit was not payable to him before he completed his initial benefit election forms and retired, and, as a result, Mr. Curtis did not rely on any belief that he was owed an Additional Benefit when he completed his benefit election forms and retired from the Company.

### Conclusion

In conclusion, for the reasons set forth above, the Subcommittee determined that Mr. Curtis is not entitled to the Additional Benefit. Accordingly, the Subcommittee denied the Appeal.

### Appeal of a Denied Claim

This response represents the Subcommittee's denial of Mr. Curtis's appeal of the denial of his claim for benefits under the Plan's claims and appeals procedures. With respect to its decision to deny Mr. Curtis's appeal, there are two points to which the Subcommittee would like to draw Mr. Curtis's (and your) attention:

- <u>Reasonable Access to Information</u>. Mr. Curtis will be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information (including a copy of the Plan document) that is relevant to your appeal.

- <u>Right to Bring Claim in Federal Court</u>. Mr. Curtis has the right to bring a civil action for benefits in federal court in Milwaukee, Wisconsin, under Section 502 of ERISA. The U.S. District Court for the Eastern District of Wisconsin, Milwaukee Division, has exclusive jurisdiction for any lawsuit involving the Plan. If Mr. Curtis challenges the Subcommittee's decision in federal court, he must do so in a timely manner. Under the terms of the Plan, Mr. Curtis must file his lawsuit no later than 24 months after the earliest of (1) the date the first benefit payment was made or due; (2) the date the Subcommittee or its delegate first denied a request for a Plan benefit; and (3) the first date he knew or should have known the material facts on which the lawsuit is based (the "<u>24-month Claims Period</u>"). However,

11

if he filed a claim for benefits under the Plan's claims and appeals procedures within the 24-month Claims Period, the deadline to file a lawsuit will not expire until the last day of the 24-month Claims Period or, if later, three months after the final notice of denial of his appeal claim is sent by the Subcommittee. If Mr. Curtis files a lawsuit after the end of the 24-month Claims Period (or, if later, the date that is three months after the Subcommittee's denial of his appeal), such action will be subject to all defenses that the Subcommittee may assert, including defenses that his claim is time-barred.

Sincerely,

Matthew Stuart

On behalf of the Claims and Appeals Subcommittee
of the Komatsu Pension and Investment Committee